Appeal of **THE PEVELY DAIRY COMPANY.**                    Docket No. 161.

The purchase of retail milk and dairy routes, the price for which is measured by the number of former customers of the vendor obtained and retained for a specified period, results in the acquisition of a capital asset, and the amount paid therefor can not be deducted as an ordinary business expense.

Cattle purchased for use in the dairy business may be accounted for by the inventory method, and should be included in the inventory from the time the title passed. In determining losses in inventory, all increase in the cattle as well as losses must be included in the inventory in ascertaining the net loss.

Submitted December 4, 1924; decided January 27, 1925.

*William Alexander Allen, Esq.*, for the taxpayer.

*A. H. Fast, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before IVINS and MARQUETTE.

FINDINGS OF FACT.

The Pevely Dairy Co. is a corporation existing under the laws of the state of Missouri and has appealed from a proposed assessment of income and profits taxes for the fiscal year ended February 28, 1920, the fiscal period ended December 31, 1920, and the calendar year 1921, as indicated in the Commissioner's letter mailed July 12, 1924.

On November 26, 1919, the Pevely Dairy Co., hereinafter called The Pevely Co., made and entered into an agreement with the City Dairies Co., a corporation, hereinafter called the City Company, the material parts of which were as follows:

Whereas the City Company is, and for some time has been engaged in the sale of milk, cream, and dairy products in the city and county of St. Louis, both in the retail trade, that is to say to domestic consumers and also to grocers, delicatessens, and other merchants who resell to domestic consumers, in original packages, and also in the wholesale trade, that is to say to hospitals, hotels, restaurants, and the like, and is also engaged in the manufacture and sale of ice cream in large quantities in the city and county of St. Louis; and

Whereas it is the desire of the City Company to increase and expand its ice cream business and its wholesale business in milk, cream, and dairy products, and to that end it desires to retire wholly from the retail trade with domestic consumers and partly from the retail trade with merchants in the city and county of St. Louis.

Whereas the Pevely Company is engaged in the sale of milk, cream, and dairy products in the city and county of St. Louis in the retail trade as hereinabove defined;

And whereas it is the mutual desire of the parties hereto for the further advancement of their respective businesses that the City Company transfer to the Pevely Company a portion of the retail trade of the City Company, together with the good will, thereto, and the equipment used therein;

Now, therefore, the premises considered, and for the considerations hereinafter set forth, the City Company does hereby sell, assign, and deliver to the Pevely Company

1. The good will of its retail business in the sale of milk, cream, and dairy products to domestic consumers within the city and county of St. Louis, Missouri, and also the good will of its retail business in the sale of milk,

cream, and dairy products to grocers, delicatessens, and other merchants, who resell in original containers to domestic consumers, and who are engaged in business in that part of the city of St. Louis lying along and upon Grand Avenue and also that part of the city and county of St. Louis lying west, northwest, and southwest of said Grand Avenue, as it now exists and as it would be if projected southwardly from its present southern extremity.

2. In execution of this agreement, the City Company promises that it, its officers, agents, and employees, will forthwith and continuously hereafter use their best efforts to induce all of its customers in the retail milk, cream, and dairy trade within the city and county of St. Louis and also within the district hereinbefore limited, to become and continue to be customers of the Pevely Company; and that it will not, on and after the 27th day of November, 1919, and for a period of 10 years thereafter, either directly or indirectly, sell or offer for sale milk, cream, or dairy products to any domestic consumer within the city or county of St. Louis, or to any person, firm, or corporation dealing in milk, cream, or dairy products within the territory on and beyond Grand Avenue, above defined, for purposes of resale to domestic consumers in the original container.

3. In further execution of this agreement, the City Company promises and agrees that it will, at time of signing of this agreement, transfer and deliver to the Pevely Company, verified lists of names and addresses of all of its retail customers, both the domestic consumers and merchants contemplated by this agreement, also maps and other practical and usual descriptions of the routes traveled and observed by its drivers, salesmen, and employees; also if requested by Pevely Company the account books kept and carried by the City Company's drivers; and also that it will give to the Pevely Company all other information, oral or written, useful or necessary for the most effective transfer of the good will of said retail business and of the permanent trade of said customers.

4. Inasmuch as certain of the retail customers of the City Company contemplated by this agreement purchase certified milk, the City Company agrees, for the more effective execution of this agreement, to direct the producer now supplying City Company with said certified milk to ship and deliver to the Pevely Company as much certified milk as Pevely Company may request, for the purpose of supplying said retail customers. But Pevely Company shall pay the producer of said certified milk the market price of the quantities of said certified milk so shipped and delivered.

5. For the further and better execution of this agreement, City Company gives to Pevely Company the use of all of the bottles of City Company now in circulation among the retail customers or the City Company contemplated by this agreement, for a period ending February 1, 1920, from the taking over of said trade. * * * For the use of said bottles Pevely Company is to pay to City Company over and above the sums hereinafter mentioned the sum of five hundred dollars ($500) which sum shall also be in full for all claims for broken or lost bottles or other damage arising out of said use of them.

6. * * *.

7. In the consideration of the transfer by City Company to Pevely Company of the good will and retail trade hereinbefore described, Pevely Company upon the terms and conditions herein contained, agrees to pay to the City Company a bonus sum of $3.00 for each retail customer of the City Company who is a domestic consumer, and who will buy and receive milk, cream, or dairy products from Pevely Company upon its terms of price and credit continuously from day to day for fifteen days from the date of transfer of said good will and retail trade; and the further bonus sum of $9.00 for each retail customer who resells milk, cream, or dairy products in original packages to domestic consumers, and who will buy or receive milk, cream, or dairy products from Pevely Company upon its terms of price and credit continuously from day to day for fifteen days from the date of transfer of said good will and retail trade. But it is understood and agreed that the Pevely Company shall and will pay on or before fifteen days from date to the City Company a guaranteed minimum sum for said customers, which sum shall be at the rate of $3.00 each for seventy-five per cent of the total number of retail domestic consumer customers turned over by the City Company to the Pevely Company and at the rate of $9.00 each for seventy-five per cent of the total number of retail merchant customers turned over. In the determination of the total number of customers of both classes turned over for the purpose

of the said guaranteed minimum sum to be paid for the above two classes of customers all customers turned over who will deal with Pevely Company for one day shall be counted regardless whether said customers deal with Pevely Company continuously for fifteen days or not. If City Company shall within fifteen days from date exhibit to Pevely Company statements of the amounts due to its creditors in Clinton, Bond, and Madison Counties, Illinois, the guaranteed minimum sum herein provided for shall be thereupon due and payable from Pevely Company to City Company. But Pevely Company in that event shall have the privilege of causing City Company to apply immediately said guaranteed minimum sum toward the payment of said creditors. Said guaranteed minimum sum, when paid to City Company in this manner, shall be credited upon the total sum due under this paragraph. In the determination of the total number of customers contemplated by this paragraph, the Pevely Company shall be entitled to credit for or deduction of rejected customers as provided in the next succeeding paragraph.

8. The Pevely Company reserves the right to reject retail customers of the City Company who reside or do business on not to exceed three present routes of the City Company, located in the outskirts of the city of St. Louis, or in adjacent parts of the St. Louis County. It is understood, however, that this privilege of rejection is an entirety as to each route.

9. The word "customer," used in this contract with reference to the obligation of Pevely Company to pay the bonus sums for seventy-five per cent of the customers of the City Company, shall mean any person, firm, or corporation who shall have bought milk, cream, or dairy products in any quantities from the City Company from day to day, continuously for fifteen days prior to transfer of the good will and trade herein provided for; who shall buy milk, cream, or dairy products for at least one day after the transfer; who is a retail customer as hereinbefore defined; and who, if he is a domestic consumer, resides in the city or county of St. Louis; and who, if he is a merchant of the class contemplated by this agreement, conducts his business within that part of the city or county of St. Louis hereinbefore limited. The word "customer" as used in this contract with reference to the number of customers for whom the Pevely Company shall pay the bonus sums named in paragraph 6, provided said customer shall deal with Pevely Company for the period of fifteen (15) days as set out in paragraph 6, shall have the same meaning as in this paragraph 9, previously defined, except only that the qualifications of fifteen days prior dealing with City Company is not to apply. If, in fact, over seventy-five per cent of the customers of City Company, as hereinbefore limited, shall deal with Pevely Company for fifteen days as provided in paragraph 6, final settlement shall be made on the total number of customers so dealing for fifteen days.

10. * * *.
11. * * *.
12. * * *.

The following memoranda appear at the foot of said contract:

ST. LOUIS, Mo., Dec. 13, 1919.

In partial execution of above contract, the City Dairies Company acknowledges the receipt from Pevely Dairy Company of the sum of eighteen thousand dollars ($18,000.00) on account of customers as per paragraphs 7 and 9 of this contract.

CITY DAIRIES COMPANY,
By W. C. CONNETT, Pres.

Received of Pevely Dairy Company $2,980.50 in full payment of balance due and in full performance of above contract.
Feb. 2nd, 1920.

CITY DAIRIES COMPANY,
By W. C. CONNETT, Pres.

During its fiscal year ended February 28, 1920, the Pevely Co. paid to the City Co. under said contract the sum of $20,980.50, measured by the number of customers of the City Co. it obtained, and at the end of its fiscal year charged such amount to loss and gain and deducted the same from its gross income for the fiscal year as an ordinary and necessary expense of its business. The Commis-

sioner disallowed the amount as a deduction and charged the same to capital account as a purchase of the good will of the City Co.

On or about March 16, 1920, the Pevely Co. made and entered into a contract with the Willis Coal & Mining Co. for the purchase of certain milk routes and other assets of the Wilco Farms dairy used in its dairy business as evidenced by the following letter:

WILCO FARMS, WILCO FARMS NATURAL MILK,
GENERAL OFFICE, 710 FULLERTON BLDG.,
*St. Louis, Missouri, March 16, 1920.*

PEVELY DAIRY COMPANY,
    *St. Louis, Mo.*

GENTLEMEN: As a result of our conference to-day, we propose to sell to you our St. Louis milk routes on the following basis:

Your company is to pay us $3 for each bona fide customer who uses milk or cream continuously for a period of fifteen days. Payment for these customers to be made as follows—one-third cash to be paid fifteen days after you commence to deliver to our customers, one-third to be paid in thirty days, and the remaining one-third in sixty days from said date that you commence to deliver to our customers.

Your company agrees to buy all horses and harness used in our milk business at an appraised value, your company to select one appraiser and our company to select the other; payment for same is to be made on same terms as for milk customers.

Your company agrees to buy all milk bottles which we have on hand either in St. Louis or Willisville at the market price of same, correct inventory to be made of same, subject to check by your representative. Terms to be the same as above.

In addition, as per agreement, you are to pay $3,000 to cover the estimated number of bottles outstanding on our routes.

Your company is to have the privilege of using our trade name "Wilco" for a period of two years or longer if mutually agreed on.

C. H. KRAUSE,
*Vice President and General Manager.*
WILLIS COAL & MINING COMPANY,
*Proprietor.*

PEVELY DAIRY COMPANY,
Accepted: PEVELY DAIRY COMPANY.

On or about April 1, 1920, the Pevely Co. paid to Willis Coal & Mining Co. under the terms of said agreement the sum of $4,614, measured by the number of customers of the Wilco Farms Dairy it had obtained, and charged such amount to loss and gain and deducted the same from its gross income for the taxable period ended December 31, 1920, as an ordinary and necessary expense of its business during that period. The Commissioner disallowed the amount as a deduction and charged the same to capital account as a purchase of the good will of the Wilco Farms Dairy.

On or about September 15, 1920, the Pevely Co. entered into an agreement with one Thomas Shields for the purchase of 145 head of cattle at $200 per head. It was the agreement of the parties that the Pevely Co. could have the cattle appraised and in the meantime was to assume the risk of any loss. About October 1, 1920, the Pevely Co. caused an appraisal to be made and the vendor was notified that the appraisal was satisfactory. It was agreed that the purchase price could be paid in October, 1921, when a trust deed upon the vendor's farm became due, and payment was actually contemplated at that time, and a bill of sale was given, dated October 26, 1921. None of the cattle were delivered until September, 1921, as the Pevely Co. was completing the purchase of a farm and the erection

of the necessary barns. The herd was managed by Shields on his farm, and he was in the employ of the Pevely Co. from March 1, 1921. From and after the appraisal in October, 1920, the cattle were considered the property of the Pevely Co. The cattle were of an average age of about five years at the time of sale, and are ordinarily profitable in herds until they reach an age of six or seven years. The market for cattle showed a steady decline from some time prior to the sale and has since continued to decline. There was a decline in value of this herd of $25 per head from the time of sale in October, 1920, to December 31, 1920, and the market value at December 31, 1921, was approximately as shown by the inventory.

The Pevely Co. took this herd into its inventory as of October 26, 1921, at the time payment was completed, together with other cattle purchased October 14, 1921, for $2,070, at an inventory cost of $31,070, and no gain or loss in the number of cattle has been disclosed. At December 31, 1921, after an appraisal had been made, the value of the cattle inventory was written down to $9,465, and the difference of $21,605 was written off in its return for the calendar year 1921. The Commissioner restored this amount to income and allowed depreciation on the original cost at the rate of 20 per cent.

### DECISION.

The determination of the Commissioner is disapproved in part and the tax should be computed in accordance with the following opinion. The amount of the deficiency will be settled on consent or on seven days' notice under Rule 50.

### OPINION.

MARQUETTE: Two questions are presented for decision on this appeal; first, whether the amounts paid by the taxpayer to the City Dairies Co. and the Wilco Farms Dairies for customers of said companies required by it under the contracts for the sale of the respective retail dairy businesses of those companies were capital expenditures or ordinary business expenses, and second, whether certain inventory losses were properly deducted.

With respect to the first question, it is the contention of the taxpayer that amounts paid by it for customers of its vendors under the contract by which it acquired their dairy routes and business were essentially ordinary business expenses, and not capital expenditures. The Commissioner held such amounts to have been paid for good will and has charged the same to capital account and disallowed the deduction thereof as an expense.

The taxpayer entered into a formal contract with the City Dairies Company whereby it specifically purchased the good will of the City Company in its retail business in the sale of milk, cream, and dairy products in St. Louis. Provisions were inserted in the contract binding the vendor to use its best efforts to induce its customers to become and continue customers of the taxpayer, and restraining the vendor from engaging in the business for a period of ten years. The consideration for the transfer of the good will and retail trade was fixed by the contract at a certain price per customer for all customers who should receive products continuously from

day to day for fifteen days, and in any event the taxpayer was bound to pay such price per customer for 75 per cent of all former customers who should deal with it for one day. Under the terms of this contract the taxpayer paid to the City Dairies Company for customers obtained the sum of $20,980.50.

We think this contract was intended to and did transfer to the taxpayer the good will of the City Dairies Co. in its retail trade in the territory purchased, and that the amount to be paid for such good will and trade was to be determined by the number and kind of customers retained and the length of time they were served by the taxpayer. The retail business of the vendor in the particular territory was the thing which this taxpayer sought to acquire, and the principal asset of value in such business was the good will which had been built up over a period of time; in fact, almost the entire value of the business was good will, and the tenor of the entire contract strongly emphasizes this fact, and seeks to make it effective to this taxpayer.

The Wilco agreement was likewise a proposal to sell its St. Louis milk routes on the basis of payment in accordance with the number of customers served continuously for fifteen days, with the privilege of using the Wilco trade name for a period of two years or longer. The proposal made no mention of good will other than the right to use the name, but we think this is of little importance. The thing sold was the milk routes and as we have said, the principal thing of value in connection with the routes was the good will pertaining to the business. In these circumstances we think the rule should apply that where a contract for the sale and transfer of a business omits to mention the good will, the presumption is that it was the intention of the parties that the good will should pass, and this presumption should be even stronger when the principal asset of value is the good will of the business. This results from the fact that the good will can not exist except in connection with the business. *Didlake* v. *B. F. Roden Grocery Co.*, 49 So. 384 (Ala.), 22 L. R. A. (N. S.) 907. Under this agreement we think the payment for milk routes, the price of which was measured by the number of customers obtained and retained for a specified period, resulted in the acquisition of a capital asset the principal element of which was good will.

The basis of the taxpayer's contention is that good will does not exist by itself and must be attached, or incident to something tangible, and can be sold only in connection with the thing to which it is attached. This is no doubt true when properly understood, but we think the taxpayer's conception of good will is too narrow. It is true that it can exist only as an incident of a business, but it is not necessary that it be connected with a place of business, or a particular article, although that is sometimes the fact. The old definition of good will as " the probability that the old customers will resort to the old place " has long since been superseded and the term now includes all that good disposition of one's customers based upon reputation for skill, punctuality, or other incidental circumstances, which constitute the good reputation one enjoys in a particular business as an incident thereof. (12 *Ruling Case Law* 977.) In this sense it is attached to the business and is subject to

sale as a part of the business. To say it must be attached to something tangible is to deny that good will can be acquired in the conduct of a retail dairy business where the delivery is to the customer. In such case there is no place to which good will could attach, and if it arises at all it must result from the product or the service rendered, and we think where the business consists of service it is capable of sustaining good will as an incident. Good will is not something which can be delivered like merchandise, but as recognized in all the definitions, it is the *probability* or *expectation* of retaining the old customers and that probability or expectation is all a purchaser can acquire. Its value is problematical and the purchaser in this case realized that fact to such an extent that the amount to be paid therefor was made to depend upon the number of customers obtained. We have no doubt that the purchases under both the contracts herein were of businesses the principal assets of which were good will and as such constituted capital expenditures rather than ordinary business expenses.

The second question results from the disallowance of certain inventory losses claimed by the taxpayer in the calendar year 1921. The taxpayer's books showed purchases of cattle in October, 1921, at an aggregate cost of $31,070, and the inventory of the cattle was written down at December 31, 1921, to $9,465 as the result of an appraisal, showing a decrease in market value of approximately 70 per cent in three months. The commissioner disallowed the loss and deducted depreciation at the rate of 20 per cent per year based upon cost.

The facts disclosed by the testimony show that the contract for the purchase of 145 head of the cattle at $200 per head was made in September, 1920, at which time taxpayer reserved the right to have the cattle appraised. The taxpayer exercised this right, and about October 1, 1920, caused the cattle to be appraised and notified its vendor that the appraisal was satisfactory. No part of the cattle was delivered until September, 1921, and payment was completed on October 26, 1921, but the product of the cows was delivered to taxpayer from the time of sale and the cattle were at its risk. The testimony shows to our satisfaction that it was the intention of the parties that the title should pass upon the appraisal proving satisfactory, and that the title to this herd passed to the taxpayer in October, 1920. The testimony shows that the market for cattle had been falling for some time prior to this sale and has since continued to fall, and that at December 31, 1920, the value of the cattle in this herd had decreased $25 per head. We are further satisfied, from the evidence, that the market value at December 31, 1921, due to the condition of the cattle, was approximately that at which it was returned by the taxpayer.

We are of opinion that the loss in value from the time the title passed should follow the title and that the cattle should have been included in taxpayer's inventory in October, 1920, and should be written down at the end of that taxable period to represent the market on December 31, 1920, and the loss to that time absorbed in that period. We think further that the inventory should show all increases or losses in inventory in each period since October, 1920, and the inventory loss on cattle adjusted accordingly in the calendar year 1921.