OPINION. Rice, Judge: The consolidation of oil-producing properties under centralized production management, commonly referred to as unit-ization, is a conservation program to effect the most economical and productive extraction of oil, gas, and associated hydrocarbon products from a given oil or gas field. Unitization may be effected by voluntary agreement of the separate owners of oil and gas properties and interests, or, in some States, by compulsory action of duly authorized State authority. When voluntary unitization is effected, it may be done by means of a community lease in which several land owners, each owning separate tracts of land, join in a single oil or gas lease describing and granting, for development purposes, the entire area owned by them to a single developer. It may also be effected by the lessees of oil development rights whose leases give them the express consent of the lessors to develop the leased property under unitized operation; or unitization may be effected by a separate unitization agreement among oil producers such as the one before us here. The participants in the unitization agreement here were fee holders or lessees, each of whom, however, had the exclusive right to develop the 64 Zone oil pool beneath its respective surface area of land. Prior to the effective date of the agreement, petitioner held two separately depletable oil-producing properties. On one, the Main Property, it had completely recovered its tax base and was claiming percentage depletion. On the other, the Result Property, it was claiming cost depletion. After unitization, it claims that it is still entitled to claim percentage depletion on that part of its share of unitized oil attributable to its Main Property, and cost depletion on that part of its share of unitized oil attributable to the Result Property. By claiming both cost and percentage depletion on the respective shares of unitized oil which it attributes to the two properties, petitioner arrives at a greater depletion deduction than the respondent’s determination would allow, since he permitted only the statutory percentage depletion on all of petitioner’s share of unitized oil. No issue is raised as to petitioner’s having a depletable economic interest in unitized oil production, but only as to the method it used in computing depletion on such production. The respondent contends that the effect of the unitization agreement here was a tax-free exchange by petitioner of its oil-producing rights in the 64 Zone pool underlying its Besult Property, and that part of its Main Property subject to the agreement, for a new and separate depletable economic interest consisting of and measured by its 71.87 per cent share of oil produced under unitized operation of the field. Section 112 (b) (1)[1] provides, in substance, that no gain or loss shall be recognized if property held for productive use in a taxpayer’s trade or business is exchanged solely for property of a like kind to be held for a like purpose. To uphold the respondent’s determination, we must find that the unitization agreement here, preferably both in form and in substance, effected an exchange; and, if not in form, certainly in substance. Our examination of the unitization agreement discloses no words of conveyance. The key provision of the agreement by which uniti-zation was effected is found in article II, section 1, as follows: The rights of Participants to develop and operate in and to produce from the 64 Zone oil * * * are hereby unitized, to the end that the 64 Zone shall be developed and operated as a unit by a single operator for the benefit of Participants. Article Y, section 1, provided that at the effective date of the agreement, the operator should take exclusive possession of the operating rights of each participant and was to enter into the performance of his duties. Article VII, section 1, provided that each participant should own the percentage of unitized substances equal to its participating equity, and article VIII, section 1, provided that each participant should accept its share thereof currently in kind. Article XI, section 1, retained for each participant the full .'right to sell, assign, transfer, quitclaim, surrender, or otherwise dispose of its interest in any land covered by the agreement, subject only to the production limitations imposed thereby. Neither in those provisions of the agreement, nor elsewhere, do we find any words of conveyance; and, more important, we find no intention on the part of the participants to convey or exchange their economic interests in the 64 Zone. We recognize that the agreement provided that all wells and production equipment used by the operator were to be held by the participants as tenants in common. But that joint ownership was only of depreciable equipment and certainly not of the depletable economic interests and rights to drill and produce oil from the land. We think the net effect of what the participants to the agreement accomplished was the creation and organization of a consolidated production operation for the extraction of their respective shares of oil from the whole pool in which they held separate operating rights. The purpose which prompted the execution of the agreement in question was the recognition on the part of the participants that unrestricted competitive production from the Zone was causing a lowering of the gas pressure and would eventually result in possible serious underground waste of oil, gas, and associated hydrocarbon products. For a period of some 5½ years prior to April 1, 1947, the participants had maintained a voluntary gas pressure program whereby a portion of the gas produced from the Zone was returned to the reservoir. We think the unitization agreement here was nothing more than another joint effort on the part of the owners of the producing rights to the Zone to best conserve their respective individual interests therein by joining in a plan for the most economical and productive operation of the whole field. Hence, we think each participant had exactly the same interests and rights in its respective properties after unitization as before, except that by mutual consent they had agreed to limit their production and operate their wells in the most economically feasible way from the standpoint of conservation considerations. The statute specifically gives a taxpayer, who owns a depletable economic interest in oil, which all concede the petitioner here had, an election to deplete its interest on the basis of the statutory percentage amount provided in section 114 (b) (3), or by recovering its cost basis, whichever is greater. It seems to us that the respondent’s determination here would deprive petitioner of the just due given it by the express terms of the statute. Having concluded that petitioner retained its original separate depletable economic interests in the 64 Zone, we turn now to the question of the exact amount of cost depletion which it is entitled to claim on the Result Property. As noted in our Findings of Fact, it computed such cost depletion on its return by allocating a portion of its share of the unitized oil production to that property on the basis of the ratio of its production from such property in 1949 to its total 64 Zone production during that year and then added such allocated amount to the actual production for the month of January 1950. On brief, petitioner argues that the allocation of a portion of its share of unitized oil production should be made on the basis of the ratio of actual Result Property production from the 64 Zone during the period of unrestricted competition preceding the effective date of the agreement to the total 64 Zone oil production during such period by all producers. The respondent insists that even if we uphold the petitioner’s position with respect to its having a depletable interest in two separate oil-producing properties both before and after unitization, as we have done, no allocation of unitized oil production can be made to the Result Property because of the mechanics involved in the computation of cost depletion. He argues that in computing cost depletion, actual production from the property each year must be subtracted from the estimated reserve at the beginning of the year.[2] He points out that under unitized operation from February 1 to December 31, 1950, some 21,672 barrels of oil were .actually produced from wells located on the Result Property. He argues further that under petitioner’s theory of allocation, a lesser number of barrels (11,859) would be allocated to that property, and concludes that under such plan of allocation, the estimated total reserves at the beginning of the period would, in fact, be exhausted long before petitioner’s theoretical cost depletion would indicate because the total production from wells on the Result Property, rather than an allocated portion, must be subtracted each year in arriving at the remaining oil reserve. We do not agree with this argument. It seems to us that the simple answer to the respondent’s objection is that oil taken from the 64 Zone through wells located on the Result Property, in excess of the allocation which petitioner contends should be made, must be deemed to be oil from other areas in the pool made possible only by the unitization agreement. Insofar as petitioner’s plan of allocation suggested on brief is concerned, we think it is in substantial accord with the agreement between the participants. The parties stipulated that each participant’s share in unitized production was based on the production record of the various properties subject to the agreement during the period of unrestricted competitive production prior to the effective date of the agreement. And while the agreement does not allocate a share of total unitized production individually to petitioner’s Main and Result Properties, we think that it was clearly the intent of the participants that petitioner’s total share was allocated on the basis of its previous production from those two properties. We therefore conclude that the ratio which 90,261 barrels bears to 3,255,417 barrels (total Result Property 64 Zone production and total 64 Zone production from April 1, 1947, to February 1, 1950), or 2.77 per cent, multiplied by the total production from the Zone under unitized operation during 1950 of 428,139 barrels, or 11,859 barrels, are the proper number of barrels allocable to the Result Property for the period February 1 to December 31, 1950. Decision will be entered under Bule 50. SEC. 112. RECOGNITION OP GAIN OR LOSS. (b) Exchanges Solblt in Kind.— (1) Pbopebti held bob productive use ob investment. — No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or Interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. Regs. 111, sec. 29.23 (m)-2.