# Didlake, Administratrix *v.* Roden Grocery Co. *et al.*

*Bill to Set Aside a Sale of Partnership Assets, and For An Accounting.*

(Decided April 8, 1909. Rehearing denied May 11, 1909.
49 South. 384.)

1. *Partnership; Dissolution; Death.*—The death of one of the part-
ners dissolves the firm.

2. *Same; Status After Dissolution.*—Title to the personal estate
·of the partnership after its dissolution by death of one of the part-
ners, vests in the surviving partner as trustee to wind up the busi-
·ness.

3. *Same; Powers of Surviving Partner.*—It is the duty of the sur-
viving partner to collect the assets and pay all the debts of the firm,
·and to dispose of the firm property to the best advantage, either
as a whole or in parcels as seems best, and it is both his right and
duty to wind up the business as soon as possible, and though he may
·continue it, for a short time in order to enable him to properly dis-
pose of the same he cannot continue it indefinitely without the con-
·sent of the representative of the deceased partner.

4. *Same; Accounting by Surviving Partner.*—A surviving partner
·is held to strict accountability as to the firm property and equity will

set aside a sale thereof made to himself upon proper application by the representatives of the deceased partner.

5. *Same; Sale; Vacating.*—Where the administratrix of the deceased partner agreed to the appointment of a representative to invoice the firm goods, and all the claims were collected, the debts paid and the goods sold in good faith, and for a fair price to a corporation composed of surviving partner and others, and the proceeds thereof distributed properly between the surviving partner and the representative of the deceased partner, the administratrix as. representative of the deceased partner cannot have the sale disaffirmed on the ground that the sale was made by the surviving partners to themselves and compel a resale and at the same time retain the proceds paid to her.

6. *Same; Settlement; Good-will.*—Although the good will of a mercantile firm is a species of property which will be considered in valuing a going concern and will be considered in the settlement of the estate of a deceased partner, if the business is continued by the surviving partner under an agreement to that end, yet, if the business is sold without agreement as to good will, it goes with the firm.

7. *Same.*—In the absence of a special agreement a surviving partner may continue the same business under the firm name, and at the same place after a sale of the firm property, and the good will of the firm goes with the property under the sale.

8. *Same; Settlement; Compensation for service.*—While a surviving partner is not entitled to compensation for ordinary services in winding up the partnership affairs, he is entitled to reimbursement for necessary expenses, so that he is entitled to receive a commission of 2 per cent. where he has collected claims belonging to the firm amounting to $125,000.00, since a collector could have been employed by him at a greater commission.

9. *Good-will; Nature and Element.*—The good will of a business is merely a hope grounded on a probability—the probability that old customers will resort to the old stand.

APPEAL from Birmingham City Court.

Heard before Hon. CHARLES A. SENN.

Bill by Molly Didlake as administratrix of a deceased partner against the Roden Grocery Company and others to disaffirm a sale of partnership effects, and for an accounting. From a decree refusing relief complainant appeals. Affirmed.

GEORGE HUDDLESTON, for appellant.—Upon the death of a partner, the surviving partners are vested with the title to all partnership property as trustees for the creditors of the firm and for themselves and the representa-

tives of the deceased partner. It becomes their duty to exercise good faith in winding up the affairs of the partnership.—*Davis v. Sewell,* 77 Ala. 262; *Farley v. Moog,* 79 Ala. 148; *Goldsmith v. Eichold Bros.,* 94 Ala. 116; *Hill v. Draper,* 54 Ark. 395. The purchase by a trustee at a sale of the trust property is voidable at the option of the *cestue que trust.*—*Montgomery v. Givhan,* 24 Ala. 568; *Andrew v. Hobson,* 23 Ala. 219; *Calloway v. Gilmer,* 36 Ala. 354; *Crutchfield v. Haynes,* 14 Ala. 49. The defense of staleness or laches must be claimed by demurrer, plea or answer and may not be allowed by the court of its own motion upon the hearing.—*Scruggs v. Decatur Land Co.,* 86 Ala. 173; *Solomon v. Solomon,* 81 Ala. 505; *Pratt Land Co. v. McLain,* 135 Ala. 452; *Shorter v. Smith,* 56 Ala. 208; *Lovelace v. Hutchinson,* 106 Ala. 417; *Ragland v. Morton,* 41 Ala. 344; *Nemo v. Stewart,* 21 Ala. 692; *Johnson v. Johnson,* 5 Ala. 90; *Maury v. Mason,* 8 Port. 211; *Humphries v. Butler,* 51 Ark. 351; *Zeigler v. Hughes,* 55 Ill. 288; *Bullock v. Smith,* 72 Tex. 549; *Livingston v. Livingston,* 4 Johns Ch. (N. Y.) 287; *Williams v. Rhoades,* 81 Ill. 571; Perry on Trusts, Sec. 868. Laches does not arise from mere lapse of time; it is founded on the inequity of allowing a party claiming a right to avoid or affirm a transaction to unnecessarily hold the right in obeyance either to be enlightened by subsequent happenings as to how he will elect to use that right so that he may acquire an undue advantage over the other party by reason of a change of conditions.—*Pratt Land Co. v. McLain,* 135 Ala. 452; *First National Bank v. Nelson,* 106 Ala. 535; *Scruggs v. Decatur Co.,* 86 Ala. 173. Administrators cannot bind estates by contracts except such as are expressly authorized by statute; 3 Mayfield's Dig. 674, et seq. Hence administrators may not bind themselves in their representative capacities by acquiescence or laches.—

*Gulf State etc. Co. v. Fasnacht,* 47 La. Ann. 1294, s. c. 17 Sou. 800; *Glenn v. Thistle,* 23 Miss. 42; *Lewis v. Lusk,* 72 Am. Dec. 153; *Dutcher v. Dutcher,* 88 Hun. 221; *Brewer v. Hays,* 22 Weekly Law Bul. 144; 11 A. & E. Encyc. of Law, 394 et seq.; 16 Cyc. 780; *Vincent v. Martin,* 79 Ala. 540.

POWELL & BLACKBURN, for appellee.—The cestui que trust must have made known their dissatisfaction within a reasonable time. At least, the beneficiary is estopped to deny the validity of an unauthorized sale so long as he detains and enjoys the benefits derived from it, and appropriates the money received from the sale. —*Andrews v. Hobson,* 23 Ala. 219; *Rogers v. Tolbert,* 74 Ala. 323; *Marks v. Clisby,* 126 Ala. 107; s. c. 130 Ala. 502. On the question of good will counsel cite.—22 Ency of Law, 222; *Fray v. Isenhart,* 116 Mich. 160; *Horton v. Horton,* 18 Fed. 816; *Lodge v. Wells,* 139 Mass. 499; *Lobeck v. Lee,* 23 L. R. A. 795. Counsel discuss other assignments of error, but without citation of authority.

SIMPSON, J.—The bill in this case was filed by the appellant against the appellees, and seeks to set aside a sale of the partnership assets to a corporation composed in part of the surviving partners.

The facts, in short, are that B. F. Roden was originally in business alone, doing business under the name of B. F. Roden & Co., and subsequently took into partnership appellant's intestate, James N. Didlake, and J. D. Harris, in 1884, the firm continuing as B. F. Roden & Co., and that it so continued until the death of said Didlake December 7, 1901; their business being that of wholesale grocers. At the time of the death of Didlake a large supply of goods had been bought for the Christ-

mas trade, and the business was continued by the surviving partners up to that time, they selling as much as possible, and purchasing only to the extent of keeping the stock in proper shape for disposition of the goods. A corporation was then organized under the name of B. F. Roden Grocery Company the stockholders being said B. F. Roden and J. D. Harris (the surviving partners), and one Bivings and one Scott, whose stock was before the filing of this bill sold to said Roden. Said corporation was organized January 1, 1902. There is some conflict in the testimony as to whether there was a distinct agreement between Mrs. Didlake, as administratrix, and the surviving partner, that the stock of goods was to be sold to the new corporation, but it is not disputed that she was requested to have some one representing her present at the taking of the inventory; that she did have her uncle, Morris, present; and that the inventory was taken under the supervision of himself and Mr. Bivings who was not connected with either the firm or the corporation at that time, but who was to become a stockholder in the corporation (and did so become) afterwards. The stock of goods was inventoried at cost and carriage, and taken at that valuation by the corporation; and the evidence shows, and reason suggests, that that was fully as much as (if not more than) could have been realized in any other way. When they came to the live stock owned by the corporation, Mr. Morris suggested that they select some third party to value them, and named J. F. B. Jackson, which proposal was acceded to by Mr. Bivings; and Mr. Jackson valued them, Mrs. Didlake taking one horse and the corporation the others at said valuation. The stock of goods inventoried something over $50,000, and the bills and notes receivable (some good and some bad) about $125,000, while the firm owed about $75,000. The corporation undertook to collect the

bills and notes, charging 2 per cent for the service, and it is testified that, whenever a customer made a payment, it was applied, first, to the indebtedness to the firm, and Mr. Bivings, who is secretary and treasurer of the corporation, states that as a result of this process the corporation lost about $5,000 which it would otherwise have been able to collect. The indebtedness of the firm has been paid off, all the claims that are collectible have been collected, and the balance has been distributed, Mrs. Didlake offering no objection, but receiving from time to time her dividends in checks of the corporation, aggregating about $17,000. It seems that she was disappointed, having expected to receive about $25,000; and, when the payments ceased, she employed counsel, and commenced this suit. There seems to be little or no controversy as to the facts.

The main contention of the appellant is that this was a purchase by the surviving partners at their own sale, which may be set aside at the option of the cestui que trust, and that the "good will" of the firm was a valuable asset which should be accounted for by the surviving partners; also, that the remainder of the term for which the building was leased was worth something. As to this last contention, it is shown that the corporation took the lease and paid the rent from the time it went into possession, and there is no evidence tending to show that the property was worth anything more than it was rented for. On the contrary, the testimony shows that at the expiration of the lease the corporation rented the same building for $25 per month less than the previous rental. The death of one partner dissolves the firm, and the title to the personal assets becomes vested in the survivor as trustee to wind up the business. It is his duty to collect the claims as far as possible, to pay off the debts, to sell out the stock of goods to the best advantage; and, while

he may continue the business for a short time, in disposing of the stock on hand, yet he is not authorized,. without the consent of the representative of the deceased partner, to continue the firm business indefinitely, nor to embark in new enterprises.  On the other hand, it is his right to wind up the business as soon as possible, and the representative of the deceased partner cannot insist on continuing.  He has the discretion to sell the stock of goods as a whole or separately as he may deem best for the interest of himself and the representative of the deceased partner.—Parsons on  Partnership  (3d Ed.) *pp. 380, 438, 440; Bates on Partnership, §§ 715, 716, 729, 731.  It is true, also, that a surviving partner is held to a strict accountability; and, if he sell the property of the partnership to himself, a court of equity will set aside the sale on a proper application seasonably made by  the representative of  a deceased  partner.— Parsons on Partnershop (3d Ed.) *pp. 442, 443, 445. This author states that, while a surviving partner has not the right to take the assets at a valuation, yet there may be cases where this mode of settlement would be best for all parties, and "a court of equity may find in particular circumstances good reason for not decreeing a sale." Star  pages 445,  446.  Another author  says, "The surviving partners have no priority of right to purchase,   *   *   *   and cannot take the property to themselves at such value without the assent of the representatives of the deceased."  Also that, "statutes and articles apart, the forced conversion of a large stock into money is almost sure to be attended with the most ruinous consequences, not only to the surviving partners, but to the estate of the deceased.  The easiest and most rational solution of which difficulties is a purchase by the survivors of the unascertained share at a just and bona fide valuation.  Hence, although both parties are, in a

sense, trustees of the deceased's interest, and there is generally a dangerous inequality of knowledge in respect to the subject-matter of the sale, yet such transaction is within the power of each to make, provided one of the surviving partners is not also an executor; and such sale, though liable to suspicion, is, if in perfect fairness, reasonable, and in good faith, valid and binding on the heirs, or distributees or creditors, and will be ratified by the court."—Bates on Partnership, § 743, pp. 789, 790. The right of the administrator to sell the interest of the deceased partner to the surviving partner, if the transaction be fair, has been sustained by the English courts; Lord Langsdale, M. R., saying: "I do not consider that it has been seriously argued here that the legal personal representative of a deceased partner may not sell the share of the deceased partner to the surviving partners, if that be done fairly and properly."—*Chambers v. Howell,* 11 Beavan, 6, 13. In the Chancery Court of New Jersey it is said that: "There is no rule of equity which prohibits a surviving partner, standing simply in that character, * * * dealing fairly, suppressing nothing and concealing nothing, from purchasing from the representatives of his deceased partner his share of the partnership assets."—*Ludlam v. Buckingham,* 35 N. J. Eq. 80. To the same effect are the cases of *Grimes' Appeal,* 105 Pa. 375, 382; *Sage v. Woodin,* 66 N. Y. 578, 581, 582; *Wilson v. Soper,* 13 B. Mon. (Ky.) 411, 56 Am. Dec. 573, 576.

The sale in the present case was not merely a sale by the administratrix to the surviving partners, but was a sale by the surviving partners to a corporation, in which the surviving partners and others were interested; and, although there is some conflict in the evidence, we think the sale was made with the approval and consent of the administratrix. She stood by until claims were all col-

lected, the stock of goods sold and scattered beyond control, and all the proceeds distributed, she receiving her portion of the same; and she cannot at this late day disaffirm the sale, retaining what she has received and involving not only the surviving partners, but the new stockholders in litigation. There is no evidence of fraud or overreaching. The arrangement seems to have been fair and just, and, in fact, the only complaint raised against it is, as before stated, that the "good will" should be accounted for. It has been said: "The good will of a trade is called by Lord Eldon the probability that the old customers will resort to the old place." "It is a hope or expectation which may be reasonable and strong and may rest upon a state of things that has grown up through a long period and been promoted by large expenditure of money. And it may be worth all the money it has cost, and a great deal more; but it is, after all, nothing more than a hope, grounded on a possibility."—*Lobeck v. Lee-Clarke-Anderson Hardware Co.*, 37 Neb. 158, 55 N. W. 650, 23 L. R. A. 799. See, also, a number of other definitions in 4 Words & Phrases, p. 3128. It is recognized as a species of property in connection with the business itself; but if the death of one partner works a dissolution of the partnership, and nothing remains but the assets to be sold and distributed among the partners, the good will becomes very nebulous. It is the duty of the surviving partner, unless there be an agreement or an order of the court to the contrary, to bring the business to a close, and wind it up, in which event the good will would disappear. It has been said that "the executor of a deceased partner can realize the share of the deceased in the good will only when he can compel a sale of the stock and premises, and then the good will goes with them; for, as a general rule, by the conveyance of a shop or store the good will of the business carried on

.in its passes, although nothing is said about it."—Parsons on Partnership (3d Ed.) *p. 263; Id. (4th Ed.) § 181. This author also states that there is high authority for the statement that the good will is not partnership property and remains wholly with the surviving partners, but favors an American decision to the effect that it is partnership property subject to distribution; and this latter statement is borne out by other authorities.— Bates on partnership, § 658. Judge Story, after giving a lucid definition of good will, says that it is not "strictly speaking a part of the partnership effects, of which, upon a dissolution thereof, a division can be compelled, unless indeed in cases where a sale of the whole premises and stock will be ordered, and then the good will will accompany such sale, and may create a speculative value in the mind of the purchaser, of which each partner will be entitled to his share of the benefit." Story on Partnership (7th Ed.) § 99. He says, also, that in case of death of one partner, causing a dissolution, the character of good will involving the right to use the partnership name belongs to the surviving partner (section 100); and in a note it is argued that, if the good will is considered a part of the partnership assets after the death of one partner, then it would follow that the surviving partner could be forced to carry on the business until such time as the good will could be disposed of, which is not the case (see note 1).

In England it has been held that a retiring partner is not entitled to any allowance for his share of good will. —*Hall v. Hall,* 20 Beavan, 139. In a case where the business of the partnership was continued by the surviving partners under express provisions in the article of partnership until a certain time, when the interest of the decedent should cease, and the partnership was really insolvent at the death of one partner, but realized profits

afterwards, it was ruled that, as the profits were entirely from the good will, the estate of the decedent would have been entitled to a share in the profits but for the agreement, under which his interest ceased at a certain time, and that in that case he was not entitled to any part.—*Wedderburn v. Wedderburn,* 22 Beavan, 84. In a case where, under the articles of partnership, the other partners had a right to remove a partner from the firm and pay for his interest, it was held that in arriving at the value of his interest the good will should not be considered—(*Stewart v. Gladstone,* 10 Chan. D. 626); the court saying that, while it could understand that the good will of a "public house" could have a value, the good will of the business of Indian commission merchants was inappreciable. Where one partner died, and the survivor sold the business to another firm, and as a part of the consideration agreed to become a partner in the new firm, as it was thought that the right to issue notes would not pass unless he continued to be a partner, the Master of the Rolls held that, as the evidence did not satisfy him that in the account which the surviving partner had rendered so much of that consideration as was for the good will had been included, a reference be ordered, to determine whether it had been included, and, if not, what its value was.—*Smith v. Everett,* 27 Beavan, 446.

The Supreme Court of New York held that the good will of a trade does not survive, and that, if the surviving partner does not choose to take the lease and the good will at a valuation, the court may order it sold—(*Dougherty v. Van Nostrand,* 1 Hoff. Ch. 68); also, that where a receiver had been appointed, on account of disagreement among partners, he would be ordered to sell the business, including the good will—(*Williams v. Wilson,* 4 Sandf. Ch. 379; *Marten v. Van Schaick & Bloodgood,*

4 Paige, 479). In a case where, by the terms of the partnership articles, the good will in the event of the death of either partner was secured to his estate for one year, and where the appraisers took the price lists and deducted therefrom a reasonable amount for the costs and expenses of sale, the court say that "by so doing the value of the good will was secured to the estate in respect to such assets," but, inasmuch as the appraisers testified that they had not taken into consideration the good will, the court refused to disturb the title and possession of the surviving partner, but reversed and remanded the case in order that the matter of good will might be inquired into.—*Rammelsberg et al. v. Mitchell et al.*, 29 Ohio St. 22, 55. On the other hand, it has been held in this country that the good will of a firm goes to the surviving partner, and that he is not required to account for it.—*Lobeck v. Lee-Clarke-Anderson Hardware Co.*, 37 Neb. 158, 55 N. W. 650, 23 L. R. A. 795, 801.

From these and other authorities we gather that the good will of a firm engaged in mercantile business is a species of property, which will be taken into consideration in valuing the business as a going concern; that, while the surviving partner is not precluded from continuing the same business under the same firm name and at the same place, yet if the business is to be continued under any agreement, and the estate of the deceased partner settled with, the good will will be taken into consideration, but the authorities are clear to the effect that if a business is sold out entirely, and nothing is said about good will, it goes with the property. This necessarily results from the fact that the good will cannot exist except in connection with the business. From this principle, and from the testimony of the witnesses, we hold that, when this business was sold to the B. F. Roden Grocery Company, the good will went with it, in so far as

there was any good will to convey. In using this expression, it is not to be understood that by the good will going with the sale the seller would be precluded from re-engaging in the same business in the same locality. That result does not follow without a special agreement to that effect.

It would be difficult at any rate to estimate the good will in this case: As to the locality (which the witnesses said had no influence on the trade), that, at best, could last only for the remainder of the term for which the house had been leased. As to the traveling men who brought in the trade, they were at liberty to quit the service at any time, and as to the name, the B. F. Roden Grocery Company, showing that it is a corporation, it is entirely different from the firm name of B. F. Roden & Co., and, at any rate, there was nothing in the nature of the partnership which would prohibit Roden from using his own name in any future partnership which he might organize. As to the charge of 2 per cent for making collections by the B. F. Roden Grocery Company, while it is true that for his ordinary services in winding up the partnership a surviving partner is not entitled to any compensation, yet he is entitled to reimbursement for any necessary expenses incurred, and, in this case, it would have been entirely proper for the surviving partner to employ a collector to collect the claims whose commissions would have been much more than 2 per cent., and the results of whose service would have been possibly not so satisfactory as those flowing from the arrangement made with the corporation.

The decree of the court is affirmed.

DOWDELL, C. J., and DENSON and MAYFIELD, JJ., concur.