**Leonard D. LAWRENCE, Plaintiff, Appellant,**

**v.**

**John A. O'CONNELL, as District Director of Internal Revenue, Defendant, Appellee.**

**No. 5123.**

United States Court of Appeals
First Circuit.

Nov. 20, 1956.

Harvey S. Reynolds, Providence, R. I., with whom H. L. Weller, Helen M. MacGregor and Weller, Reynolds & Johnson, Providence, R. I., were on brief, for appellant.

Morton K. Rothschild, Atty., Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Joseph Mainelli, U. S. Atty., and Samuel S. Tanzi, Asst. U. S. Atty., Providence, R. I., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment for the defendant as District Director of Internal Revenue in an action brought to recover the amount with interest of a deficiency in 1951 income taxes duly assessed against the plaintiff and paid by him in 1954. There is no dispute over the following basic facts as found by the District Court after trial without a jury.

The plaintiff-appellant-taxpayer, during the year 1951 and for many years preceding, was a vice-president, a director, and the owner of 15% of the stock of Bostitch, Inc., a Rhode Island corporation. The taxpayer's sister and her children owned another 15% of the Bostitch stock, and a cousin of the taxpayer living in Scotland owned 11¼% of it. The president of the corporation, one Whalen, owned 5% of the stock and another vice-president, one Maynard, also owned 5%. Bostitch stock has always been closely held and it has never been traded on any exchange or even over the counter.

Bostitch had prospered over the years under Mr. Whalen's management and direction, and in 1951, when he was in his middle sixties, Mr. Whalen began to consider ways and means of obtaining top quality management for the corporation after his retirement and also ways and means of establishing a market value for his stock for estate tax purposes. After considering various alternatives which need not be outlined, he proposed and began negotiations for a merger of Bostitch with a larger corporation in the same general line of business the stock of which was traded on the market. The taxpayer, following consultation with his financial adviser, decided that such a merger would be inimical to his interest, and he persuaded his sister and her children that it would be inimical to their interest as well. But they could not block a merger for together they controlled only 30% of the Bostitch stock and under Rhode Island law a corporation can merge with another by vote of 66⅔% of its stock. In this situation, the taxpayer began to cast about for other stockholders to go along with him and his sister and her

children in opposing the proposed merger.

He negotiated with his cousin in Scotland, but could not persuade her to commit herself definitely, and then, after further consultation with his financial adviser, he offered his fellow vice-president and long-time associate in Bostitch, Maynard, $50,000 for his proxy. This proxy, if obtained, would put him in control of 35% of the Bostitch stock and enable him to prevent that corporation from merging with any other.

Mr. Maynard hesitated for a few days and then agreed to accept the taxpayer's offer. The taxpayer consulted his counsel who advised that since a proxy was merely a power of attorney it would automatically be revoked should Mr. Maynard die (he was seventy-five years old), and that furthermore it could be revoked by Mr. Maynard at will during his lifetime. This was not the sort of proxy the taxpayer cared to pay $50,000 for, and counsel explained that the proxy could be made to survive Maynard's death and to be irrevocable during his lifetime if it were coupled with an interest. The upshot of further negotiations between the taxpayer and Maynard and their respective counsel was a proxy agreement coupled with an option. By this agreement Maynard gave the taxpayer, his heirs, executors and administrators, an irrevocable proxy with full power of substitution to vote his, Maynard's, Bostitch stock, plus an option to purchase Maynard's stock at any time within six months after his death at 9/7 of book value calculated within thirty days of his demise. In return the taxpayer paid Maynard $50,000 and agreed if asked by Maynard's executors to buy from them at the same price enough of Maynard's Bostitch stock to finance his death taxes. As a result of this agreement the taxpayer and his sister and her children had voting control of 35% of the Bostitch stock and were in a position to prevent any merger. In this state of affairs the merger proposition was dropped for lack of favorable stockholder support.

The taxpayer deducted the $50,000 he paid for the proxy and option from his gross 1951 income on the ground that it was a non-trade or non-business expense within the meaning of § 23(a)(2) of the Internal Revenue Code of 1939 as amended by § 121(a) of the Revenue Act of 1942 (56 Stat. 819); 26 U.S.C., 1952 ed., § 23(a)(2) quoted in the margin.[1]

The Commissioner disallowed the deduction and assessed a deficiency accordingly. The taxpayer paid the deficiency, filed a claim for refund, which was not allowed, and then brought the instant action.

The taxpayer's argument here as in the court below rests primarily upon the proposition that the substance of his transaction with Maynard was to acquire an effective proxy to vote Maynard's stock against a merger, and that the option feature of the transaction was "only an incidental legal device" or a mere "incident of the contract," never mentioned, thought of or bargained for by the parties, but included in their arrangement solely on the advice of counsel for no other purpose than to make the proxy irrevocable and hence effective and enforceable. Thus he says that his payment to Maynard was not for the acquisition of a capital asset but was only to obtain an irrevocable proxy which he needed for the conservation of his investment in Bostitch, and from this he argues on the authority of Commissioner of Internal Revenue v. Bagley & Sewall Co., 2 Cir., 1955, 221 F.2d 944, and

---

1. Sec. 23. Deductions from Gross Income.
    In computing net income there shall be allowed as deductions:
    (a) *Expenses.—*
       *    *    *    *    *
    (2) *Non-trade or non-business expenses.*
    In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

similar cases many of which are cited therein, that the option feature of the contract does not prevent him from deducting the cost of the proxy as an expense incurred for the conservation of his Bostitch stock.

We may concede, although in this case we need not and do not decide, that if the taxpayer under the circumstances disclosed had paid Maynard $50,000 for an ordinary proxy, he would be entitled to deduct its cost as an ordinary and necessary expense under § 23(a) (2), supra. But this is not the kind of proxy the taxpayer wanted, bargained with Maynard for, or obtained. He wanted and got from Maynard an irrevocable proxy, that is, one that could not, at least without legal liability, be revoked by Maynard at any time, and one that would not automatically be revoked should Maynard die. This factor of irrevocability was vitally important to the taxpayer for without it the taxpayer might not be able to accomplish his purpose of preventing the merger and in that event his $50,000 would be lost. And the only way he could get the kind of proxy he wanted was to couple it with some property interest in Maynard's stock, in this case the option. Thus the option was not a mere "incidental legal device." Instead it was an important, indeed, an essential and vital element of the contract.

Furthermore, the option was definitely valuable. It had value not only to make the proxy irrevocable, but it also had independent value of its own for Maynard was alive at the time of the trial, and so far as we know he is still, and it is quite possible that Bostitch stock will have a market value within six months of Maynard's death in excess of 9/7 of its book value calculated within thirty days of his death. In that event, of course, the option will prove of value and it certainly would not do to let the taxpayer deduct as an expense for the conservation of property what might turn out to be a profitable investment. We cannot see how the contract can be split into two separate and distinct transactions, one for a proxy and another for an option.

Moreover, even if the option and proxy were separable, the Court below was correct in finding that the taxpayer had failed to prove any calculable element of cost attributable to the proxy as distinct from the option.

There is no occasion to discuss the cases relied upon by the taxpayer, for not only are all quite different on their facts, but also in each of them the taxpayer could show that he had already actually suffered a calculable loss. This, as we have pointed out, the taxpayer here cannot yet establish. Indeed, on the contrary, he may eventually make a profit. He must at least await the event of a loss before he can deduct the cost of his contract. Whether such loss would be a capital loss or deductible as a nonbusiness expense, we do not need to determine where as here no loss has been proven.

The judgment of the District Court is affirmed.