**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**BELRIDGE OIL COMPANY,
Respondent.**

**No. 15887.**

United States Court of Appeals
Ninth Circuit.
May 11, 1959.

Charles K. Rice, Asst. Atty. Gen., Marvin W. Weinsten, Melva M. Graney, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., for petitioner.

Parker, Milliken & Kohlmeier, John B. Milliken, Harrison Harkins, Los Angeles, Cal., for respondent.

Before CHAMBERS, BARNES and HAMLIN, Circuit Judges.

CHAMBERS, Circuit Judge.

Belridge is a large oil producer in the North Belridge field in Kern County, California. Most of its holdings of more than 38,000 acres are in fee simple and are within what is known as its "Main property." This interest was acquired in 1911. Its whole cost basis has long ago been recovered in depletion allowances, but, as it may, it continued on its income tax returns to take a percentage depletion [1] on oil captured from its wells during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph." 26 U.S. C.A. §§ 23(m), 114(b) (3).

Reference also should be made to that portion of Treasury Regulations 111, 26 C.F.R., 1949 Edition, reading as follows:

"Sec. 29.23(m)–1. Depletion of mines, oil and gas wells, other natural deposits, and timber: depreciation of improvements.—

\* \* \* \* \*

"When used in these sections (29.23 (m)–1 to 29.23(m)–28, inclusive) covering depletion and depreciation—

\* \* \* \* \*

"(b) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much

---

1. The case arises under the 1939 Internal Revenue Code. Section 23(m) is the basis from which cost depletion is projected. Percentage depletion comes out of Section 114(b) (3). The sections are as follows:

"§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions: \* \* \*

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*

\* \* \* \* \*

"§ 114. Basis for depreciation and depletion. \* \* \*

"(b) Basis for depletion.—

\* \* \* \* \*

"(3) Percentage depletion for oil and gas wells. In the case of oil and gas wells the allowance for depletion under section 23(m) shall be 27½ per centum of the gross income from the property

on the Main property. More recently, about 1945, in this North Belridge field, it acquired at high cost all of the rights to oil in an adjoining 80 acre tract known as the Result property.[2] On this, Belridge has taken and desires to take its depletion on a cost basis. Here in this field, as in many fields, oil and gas are found at various depths in strata, layers or zones, the zones each being self-contained, distinct and separate from each other, or at least substantially so.

Our income tax problem here for the year 1950 concerns only the 64 zone. It lies intermediate between other zones in Belridge's Main property and extends under the surface of Result and other adjoining North Belridge field properties formerly operated and still owned by or leased to the Texas Company, Union Oil Company of California, Richfield Oil Corporation, Tidewater Associated Oil Company and Standard Oil Company of California. Among the zones in which Belridge has an interest is the Tremblor zone. It lies under its Main and Result surfaces. With the Tremblor, we shall be only incidentally concerned. (There was no production from the Tremblor zone at Result during 1950.)

Prior to October, 1941, production of Belridge and five other companies from

the 64 zone was entirely on a competitive basis. By a voluntary gas pressure maintenance program production of the companies was put on a more limited basis from October, 1941, to April, 1947. Then until February 1, 1950, the old competitive basis again obtained. In 1949 Result furnished 5.74% of Belridge's production of oil from the 64 zone or 3.55% of the production of all producers from the 64 zone.

For reasons of conservation which was effected here mainly through control of gas pressure, the parties late in 1949 negotiated a written unitization agreement.[3] Under the contract Belridge, the largest producer on the 64 zone, became the sole operator of all wells of it and the five other companies tapping the 64 zone in the North Belridge field. As to petitioner, this included 64 zone as it lay under its Result and its Main properties. The production, the agreement said, was to be divided in percentages and distributed in kind. The percentages for distribution were calculated on a basis in relation to the production of each company in Zone 64 during the period of unlimited production preceding the effective date of February 1, 1950. Under unitization, Belridge was entitled by the agreement to receive 71.87% of the 64

of the surface of the land only as is necessary for purposes of mineral extraction. The value of a mineral property is the combined value of its component parts.

"(c) The term 'mineral deposit' refers to minerals in place. The cost of a mineral deposit is that proportion of the total cost of the mineral property which the value of the deposit bears to the value of the property at the time of its purchase.

\* \* \* \* \*

"(i) 'The property,' as used in section 114(b) (2), (3), and (4) and sections 29.23(m)–1 to 29.23(m)–19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate 'property'; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be

a single 'property,' provided such treatment is consistently followed."

2. While not material to the decision of the case, it appears that Belridge acquired the property (at a price that was probably more than it was worth in and of itself) for the purpose of preventing it being used by a neighbor for bleeding the field. In short, it wanted it for control. Now it wants to get its high cost back on the basis of depletions on a cost basis.

3. California does not provide for compulsory unitization. However, its statutes do contemplate voluntary unitization and require that before any unitization can be effected there must be a determination by the state oil and gas supervisor that the agreement is in the interest of avoiding unreasonable waste. West's Ann.California Public Resources Code, § 3301. Such determination was here made and the agreement so approved.

zone production. The remaining 28.13% was divided among the other companies according to their agreed percentages. The unitization schedule did not concern itself within any fractions of separate properties of any one producer, just one percentage for each interested company. So there was in the agreement no allocation as between Belridge's Main and Result properties on the 64 zone.

In 1949 the total combined 64 zone production was 867,915 barrels. In January, 1950, the total production was 64,010 barrels. We note the effect of unitization when it appears that for the eleven months, February 1 to December 31, 1950, production dropped to a total of 428,139 barrels. Of this amount, Belridge's 71.87% in kind was 307,704 barrels. For the eleven months of unitization, on its 1950 return Belridge allotted 17,662 barrels to Result and 290,-042 barrels to Main. On a cost basis, Belridge took $3.40 (plus) a barrel on the barrels allotted to Result. On a straight percentage depletion on the oil allocated by Belridge to Result the allowable depletion would be substantially less with a resultant increase in taxes of about $50,000, so said the commissioner. On this amount both normal and excess profits taxes were involved. Parenthetically, it should be noted that under unitization for eleven months of 1950 Belridge as the unit operator actually extracted 21,672 barrels from the 64 zone from the wells on the Result property, some 3,900 more barrels than it allotted to itself on Result for income tax purposes.

We believe that the unitization agreement is adequately described in the opinion of the Tax Court, Belridge Oil Co. v. Commissioner, 27 T.C. 1044, to which reference is here made. Suffice it to say here that the agreement contained no words of conveyance. It may be as-sumed that this fact alone would not be conclusive for determination of the case.

In his office and before the Tax Court, the commissioner took the position that the unitization bargain accomplished a tax free exchange of two separate property interests for a new property interest,[4] and that two rules for depletion could not be apportioned within one new single property interest of Belridge. Of course, if such an exchange did occur there would be no doubt the commissioner's conclusion was and is correct.

The Tax Court sustained Belridge, the taxpayer. It did recast some of the figures, and reached a result that the taxpayer was subject to a deficiency of $1,246.97.[5] This deficiency has already been paid. In the minor readjustment of the figures, there is no issue. There just remains the big one: Can the taxpayer after this particular unitization cling still to its cost depletion for Result on oil he allots (based on percentages of experience on 64 zone before unitization) to Result.

 Taxpayer complains that the commissioner here imports a new theory of merger of property interests into the review, something that was never presented to the Tax Court. So it says, first we should not consider this merger idea. Second, if we think it must be considered, then we should send the case back to the Tax Court for development of that issue. This complaint of the taxpayer has merit. One does not repudiate Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 381, 68 S.Ct. 1, 92 L.Ed. 10, when one holds the government to its positions intelligently taken in litigation. Private parties are held to them and so is the government. See General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154. Litigation must move ahead and certainty is still a virtue. Probably as a part of certainty,

4. The statutory section in the 1939 Internal Revenue Code on exchanges and tax free exchanges is Section 113, 26 U.S.C.A. § 113.

5. It would appear that the Tax Court made a slightly different percentage apportionment between Main and Result, but it allotted to Result for 1950 less oil than was actually produced thereon.

it is a familiar rule of appeal and error that decisions may be upheld on a ground acceptable to the appellate court (but not relied on by the trial court) even though the ground of the trial court is rejected. Except in the manifest error cases, it is the rule that an appellant cannot stand on a new ground found first in the appeal.

One of the first questions here is whether there was any "exchange", of property as known to the income tax law. If we should find an "exchange" then one would next be required to consider whether it was a tax free exchange. After these questions are answered, one is ready to proceed to the depletion questions.

■ This court is of the opinion that in income tax language there was no exchange. A fortiorari, we would agree with the Tax Court that there was no tax free exchange. Therefore, we really do not come to the question of whether the commissioner can or has taken new ground. Moreover, we should not reach the issue of sending the "merger" concept back to the Tax Court for development. Essentially the view we take of the unitization transaction is that it amounts to no more than an agreement as to how the parties will use that which they already had. And, we see no more reason to here attach tax consequences than there would be to finding them in a pipeline leading away from the field in which oils of various producers have been commingled. (Of course, an "interest" in the extraction of oil is required before depletion arises and to that extent the pipeline concept is not apposite). While the place of capture of oil is deep in the concept of income tax incidence, and thus probably prevents a man with the Main

and the Result from unitizing himself (but keeping his properties' depletion accounts separated) and willy nilly taking his depletion from whatever well he chooses to allot it,[6] and thus to euchre the tax collector, still we know that capture of oil is not the only factor to be taken into account in figuring depletion. One doesn't have to have any ownership in oil in the ground to get depletion. See Commissioner of Internal Revenue v. Southwest Exploration Company, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347. Our view in Belridge's case is that the commingling of interests in oil (and still the interests here were in kind) did not occur until the oil was captured. If owner A received more oil than was produced from his land, then on such excess he was entitled to take his depletion, we think, just as the upland owners of whipstock drilling sites obtained it in Commissioner of Internal Revenue v. Southwest Exploration Company. And similarly the man whose land produced more oil than his aliquot portion under unitization loses his depletion just as it was lost to the producer in Southwest Exploration.

While we affirm the tax court, caveats may well be issued. For example, it would be easy to draw unitization agreements which would get the parties into an exchange concept with a new economic unit resulting. Then the taxpayer could no longer use one rule of depletion for Blackacre and another one for Whiteacre.

The case is somewhat different, but we regard our decision herein as in accord with Whitwell v. Commissioner of Internal Revenue, 5 Cir., 257 F.2d 548, 551.

Affirmed.

6. Under the regulations quoted in footnote No. 1 infra, one may combine his two separate contiguous properties, thus apply one rule of depletion to the entire combination. But he cannot alone "self-unitize" under the regulation preserving his separate depletion accounts without respect to the point of capture.