NELSON WEAVER REALTY COMPANY, and Nelson Weaver Mortgage Company, Inc., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 19226.

United States Court of Appeals Fifth Circuit.

Sept. 12, 1962.

Rives, Circuit Judge, dissented in part.

898

Alfred M. Naff, Birmingham, Ala., Deramus & Johnston, Birmingham, Ala., of counsel, for petitioners.

Crane C. Hauser, Chief Counsel, I. R. S., John M. Morawski, Atty., I. R. S., John B. Jones, Jr., Acting Asst. Atty. Gen., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before RIVES, CAMERON and GEWIN, Circuit Judges.

CAMERON, Circuit Judge.

These consolidated cases involve deficiencies in federal income tax for 1955, as determined by the Commissioner, in the amount of $3,666.02 in the case of Nelson Weaver Realty Company, and $54,192.89 in the case of Nelson Weaver Mortgage Company. The decisions of the Tax Court we are called upon to review under § 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482 were entered March 17, 1961 and are reported at 35 T.C. 937, where the terms of the contracts and the detailed facts may be found.

The questions presented are whether the Tax Court erred in deciding the amount of $121,841.11 received by petitioner Nelson Weaver Mortgage Company, pursuant to an agreement with Cobbs, Allen and Hall Mortgage Company, was taxable as ordinary income rather than as capital gain; and whether the Tax Court erred in deciding that the amount of $8,000.00 paid to Nelson Weaver Realty Company by Cobbs, Allen and Hall, a partnership, was taxable as ordinary income from a covenant not to compete rather than as a gain from the sale of a capital asset. The Commissioner ruled that each transaction was taxable as ordinary income. He determined a deficiency against Mortgage Company for the fiscal year ending September 30, 1955 in the amount of $54,192.89 and a deficiency for the calendar year ending December 31, 1955 to the Realty Company in the amount of $3,666.02. The Tax Court sustained the actions of the Commissioner. These petitions for review by the Mortgage Company and the Realty Company were consolidated for hearing in this Court. The case of the Mortgage Company will be taken up first.

Mortgage Company is a corporation under the laws of Alabama and has, since 1946, been engaged in the business of procuring, selling, brokering and servicing mortgage loans, and in renting and holding real estate for investment purposes and other related activities. Nelson Weaver is its president and owner of controlling stock in the corporation. It keeps its books and records and reports its income on the accrual method of accounting.

Mortgage Company[1] and New York Life Insurance Company entered into a mortgage sales and service agreement (sometimes called a correspondence contract or agency contract) during the year 1947. On May 5, 1953, a new contract was entered into whereby Mortgage Company became the mortgage sales and servicing agent for New York Life in the cities of Birmingham, Gadsden, Anniston, Decatur, Huntsville, Tuscaloosa, Montgomery, Demopolis, Florence, Sheffield and Tuscumbia, all in Alabama.

January 29, 1955, Mortgage Company entered into a purchase and sale agreement with Cobbs, Allen and Hall Mort-

1. Under its previous name of Hodo-Weaver Mortgage Co., Inc., which was changed to the name of petitioner when Nelson Weaver bought out the interest of Hodo.

gage Company, Inc. by which it sold "all of the rights, title, obligations, and benefits pertaining to the servicing contract of all of the mortgages now being serviced by the Birmingham office of Nelson Weaver Mortgage Company, Inc. for the New York Life Insurance Company, subject to the approval of New York Life Insurance Company." Mortgage Company received, as of January 29, 1955, $35,241.11 of the total purchase price of $121,841.11. It received notes, one due November 1, 1955 in the sum of $43,300.00, and the second for the same amount due November 1, 1956. Each of the payments was due in a separate fiscal year of Mortgage Company, and its tax returns were made accordingly. § 432, Internal Revenue Code of 1954 and Rev. Rul. 55–374. New York Life Insurance Company having given its approval to said sale, Mortgage Company delivered to Cobbs-Allen its complete files, ledger cards and all papers pertaining to the mortgages described in the agreement and a current tabulation of the balances then due. It reported a taxable income for the calendar year 1955 of $39,067.23 and paid the tax shown to be due thereon, claiming that the transaction with Cobbs-Allen was a sale of capital assets.[2]

■ The Commissioner held with the approval of the Tax Court and the Government now argues, that the income derived from the deal between Mortgage Company and Cobbs-Allen was not subject to capital gains treatment. The gist

of its argument is that what Mortgage Company really received "was consideration for the transfer of the contingent right to earn future compensation," so that the total payment called for in the sales contract to Cobbs-Allen has the taxable character of the income for which it is a substitute." We think that the transaction before us represents clearly a sale of a capital asset and that the Commissioner and the Tax Court erroneously held otherwise.

The Commissioner's argument centers around his contention that the taxpayer erroneously assumes that the term "property" has a broad meaning, and that a broad construction should be applied in interpreting the tax laws with respect to what constitutes "property," when the opposite is true. We have no quarrel with the Commissioner's position in that regard; but we think that the realities of the situation with which we are dealing, based upon the writings and facts and circumstances about which there is no real dispute, compel the conclusion that the subject of this sale was a capital asset of Mortgage Company. There is no contention by the Commissioner that the transaction is infected with any deception or the use of any devious scheme to convert into capital gains what would normally be ordinary income.

It is undisputed that the taxpayer here was in the business of a mortgage loan company whose activities embraced the preparation and making of mortgage

2. § 1221, Internal Revenue Code of 1954, 26 U.S.C.A. § 1221:
   "Capital asset defined
   "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
   "(2) property, used in his trade or business, of a character which is subject to

the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *
   "(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or
   "(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue."

loans, the sale of such loans to permanent investors, and the servicing of the loans after sale. Cf. Abbott Mortgage Co., 17 C.C.H., T.C.Mem. 542 (1958). The relationship between Mortgage Company and the New York Life was the one normally attending such an arrangement. The Insurance Company had a great volume of money which it desired to lend; Mortgage Company had the facilities for seeking out and making loans, but it did not have the vast amount of capital necessary to carry the loans to their maturities. Mortgage Company, therefore, made arrangements with New York Life and other lending agencies to purchase loans made by it, inter alia, in the cities named supra. It was paid brokerage fees on all loans initiated and completed by it and sold to New York Life, this forming an important item of its income.

New York Life was without ready facilities for servicing the loans, i. e., collecting the payments over a term of years, seeing that insurance and tax payments were promptly made, etc.; but Mortgage Company did have an organization equipped to perform such services. The contacts between Mortgage Company and the mortgagors gave it access to a large field of customers for other dealings, such as writing of hazard insurance, automobile liability insurance, purchase and sale of real estate, renewal of mortgages, and the like. The testimony on this subject is explicit and is not contradicted. The relationship between Mortgage Company and New York Life in the areas covered by their contract was, therefore, one of value to both.

Cobbs-Allen was in a similar business and had a similar (but not competitive with Mortgage Company) arrangement with New York Life. It was natural that it should be interested in purchasing from Mortgage Company the congeries of rights inhering in the relationship founded upon contract and upon years of satisfactory dealings which had exsited between Mortgage Company and New York Life. It made an offer to Mortgage Company and Mortgage Company accepted that offer at an agreed price to be paid in three installments. The bundle of rights belonging to Mortgage Company as the result of its long standing relationship with New York Life, constituted property which was undoubtedly the proper subject of sale.[3]

The Commissioner's contention that Mortgage Company had nothing to sell, because its contract with New York Life was subject to short term cancellation and that it was salable only upon New York Life's approval is, in our opinion, without merit. The Commissioner ar-

3. Eliasberg Bros. Mercantile Co. v. Grimes (1920), 204 Ala. 492, 86 So. 56, 57, 11 A.L.R. 300; Boyd v. City of Selma (1892), 96 Ala. 144, 11 So. 393, 394, 16 L.R.A. 729; Alabama State Federation of Labor v. McAdory (1944), 246 Ala. 1, 18 So.2d 810, certiorari granted, 323 U.S. 703, 65 S.Ct. 191, 89 L.Ed. 567, certiorari dismissed, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; Carter v. Knapp Motor Co. (1943), 243 Ala. 600, 11 So.2d 383, 144 A.L.R. 1177; Lash v. State (1943), 244 Ala. 48, 14 So.2d 229; Hill Grocery Co. v. Carroll (1931), 223 Ala. 376, 136 So. 789; Stewart & Fontaine v. Hargrove (1953), 23 Ala. 429; Commissioner v. Stephens-Adamson Mfg. Co., 7 Cir., 1931, 51 F.2d 681; Citizens State Bank of Barstow, Texas v. Vidal, 10 Cir., 1940, 114 F.2d 380, 382; Lawrence v. O'Connell, D.C., R.I., 1956, 141 F.Supp. 316, affirmed 1 Cir., 1956, 238 F.2d 476; Appalachian Electric Power Co. v. United States, 1958, 158 F.Supp. 138, 141 Ct.Cl. 367; Jones v. Corbyn, 10 Cir., 1950, 186 F.2d 450, 453; 3B Mertens Law of Federal Income Taxation, § 2212, p. 62 et seq.

And see also Income Tax Reg. § 1.1221-1(a): "The term 'capital assets' includes all classes of property not specifically excluded by § 1221."

And see also Rev.Rul. 55-374, 1955-1, Cum.Bull. 370:

"§ 11(a) of the Internal Revenue Code of 1939 does not exclude from the term 'capital assets' a contract of the type herein concerned, which is sold by a taxpayer who is not, for federal income tax purposes, a dealer in such contracts."

And cf. Kenney, 37 T.C. 1161 (Mar. 29, 1962) and Ayrton Metal Co. Inc. v. Commissioner (2 Cir. 1962), 299 F.2d 741, 748.

gues that no one would purchase a contractual relationship subject to such right of termination. He argues further that what Mortgage Company owned was salable only with the consent of New York Life. The short answer to these contentions is that they deal only with possibilities and not with actualities. The fact is that New York Life had maintained the relationship with Mortgage Company for eight years, during which time Mortgage Company sold to New York Life about fifty-five percent of its total number of loans running into millions of dollars. (The figure at the time of the sale was approximately $15,-000,000.00.) Mortgage Company had built up a large organization dependent in great part upon the permanence of the arrangement existing between it and New York Life. Maybe it took a risk, but risk lies at the basis of all dealings in property and business and constitutes one of the realities of business life and of taxation. Adopting the essence of a statement by Mr. Justice Holmes in Compania General, etc. v. Collector, 1927, 275 U.S. 87, 100, 48 S.Ct. 100, 72 L.Ed. 177, we said, in Texas Trailercoach, Inc. v. Commissioner, 1958, 5 Cir., 251 F.2d 395, 403: "The closer a tax comes to giving effect to the economic realities, the more bearable it is as the price of national security and of civilization." And the economic reality is that New York Life did give its approval to the sale by Mortgage Company to Cobbs, Allen and Hall and that such transactions are by no means unknown to the business world.

The Commissioner develops at some length, as his chief argument, that the amount paid to Mortgage Company by Cobbs-Allen could be demonstrated to be approximately the gross amount of the service charges which would be paid in connection with the servicing of the items of outstanding loans transferred by the taxpayer to Cobbs-Allen. Mortgage Company demonstrates that this gross figure bore no persuasive relationship to the net income which would be derived from the servicing of the outstanding mortgages.[4]

Cobbs-Allen purchased, therefore, not only the right to service approximately 1,830 mortgages, but it received from Mortgage Company all of the records and files which had been compiled over the years in connection with those mortgage loans. Cf. Rev.Rul. 55-79, 1955-1, Cum. Bull. 370. It obtained also the list of the approximately 1,600 mortgagors who had been the satisfied customers of Mortgage Company and who were figuratively tied to their agent through whom they had dealt through the years. These were a ready-made market, not only for future loans, but as prospects for the sale of homes, lease of apartments, sale of insurance on homes, automobiles and like items. Upon the completion of the sale Mortgage Company severed all connections with this large aggregation of mortgagors and turned over this valuable relationship, with all of its records, to Cobbs-Allen.

It cannot be doubted that the sum total of the ingredients of this long-standing relationship with such a satisfied clientele constitutes a property right which is the equivalent of good will— the probability that the old customers will resort to the old place. Didlake v. Roden Grocery Co., 160 Ala. 484, 49 So. 384, 22 L.R.A.,N.S., 907 (1909). And it is equally plain that such a property right is a capital asset. Michaels, 12 T.C. 17, 19 (1949) acq. 1949-1 Cum.Bull. 3; Aitken et al., 35 T.C. 227 (1960), and Cox (1952), 17 T.C. 1287. And, without dispute, the capital asset here involved had been held more than six months, the economic value having been building up over an eight year period and the contract then in force between Taxpayer and New York Life having been entered into

4. According to Mortgage Company's figures, Cobbs-Allen could expect a net return from the service fees arising from the mortgages assigned in the contract before us of only $16,276.00, being less than one-seventh of the purchase price of the contract.

·May 5, 1953, prior to the sale on January 29, 1955.

In support of his position here the Commissioner relies heavily upon three recent Supreme Court cases, Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29; Commissioner v. P. G. Lake, Inc., 1958, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; and Commissioner v. Gillette Motor Transport, Inc., 1960, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617. We do not think that these cases establish principles which are applicable to the facts before us. A brief analysis of their holdings will demonstrate this.

In Corn Products Refining Co., the Tax Court, 16 T.C. 395, the Court of Appeals, 2 Cir., 215 F.2d 513, and the Supreme Court found specifically that the taxpayer regularly dealt in corn futures as part of its everyday business operations and they were, therefore, judicially excluded from the definition of capital assets.[5]

By no stretch of the imagination can the routine day-to-day sale of corn futures be equated with an isolated sale of an agency contract. Here the taxpayer sold and transferred a franchise or contract which for eight years had constituted one of the chief items of its capital structure. It was not engaged in selling and transferring mortgage sales and servicing contracts. This was one isolated transaction in which the taxpayer disposed of property which was the means by which it had conducted more than half of its business operations over a period of years.

In Commissioner v. P. G. Lake, Inc., supra, the taxpayer received from the sale of an oil payment an amount exactly equal to the "face value" of the oil payment transferred, which was expected to and did pay out in slightly more than three years. The interest transferred to the assignee was to terminate after the assignee had received the $600,000.00, the interest which was assigned, plus an amount equal to three percent on the unpaid balance. The seller kept a reversionary interest in the property sold, the purchaser received nothing but a right to payments, which right was to terminate as soon as the $600,000.00 plus three percent interest was paid. What was sold, therefore, was the right to receive money in the future, the sales price being almost the exact equivalent of the income which was to be produced in the future.

We have no such situation here. The amount paid to the taxpayer here bore no convincing resemblance to the amount the purchaser would actually collect out of the service contract sold since the purchaser had to pay the cost of the collection. Taking the collection costs

---

5. "Both the Tax Court and the Court of Appeals found petitioner's futures transactions to be an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements. * * *

"We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. * * * Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation. * * *

"It matters not whether the label be that of 'legitimate capitalist' or 'speculator'; this is not the talk of the capital investor but of the far-sighted manufacturer. * * *

"Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.'"
[350 U.S. 50, 51, 52, 76 S.Ct. 23]

into account, the purchaser here would receive from the fees arising from servicing of the mortgages only a fraction of the purchase price of the bundle of rights it acquired from Mortgage Company. Without the other items discussed supra, the transaction here would have been nothing less than an economic absurdity.

Gillette Motor Co., supra, involved the question whether the amount received by it as compensation for the temporary taking by the Government of its business facilities for a period of about ten months during World War II constituted ordinary income or capital gain. The taking was occasioned by a strike which denied the government access to the transportation facilities so desperately needed during that period. In accomplishing the taking the federal official announced his intention to leave title to the properties in Gillette and to interfere as little as possible in the management of them.

The Motor Carrier Claims Commission allowed in this and all similar cases the fair market value of what was taken, which it held to be nothing more than the use of the facilities entitling Gillette to the fair rental value with interest. Gillette claimed that what was taken was property, which the Supreme Court concedes, stating, however (364 U.S. 133, 80 S.Ct. 1500): "But the fact that something taken by the Government is property compensable under the Fifth Amendment does not answer the entirely different question whether that thing comes within the capital-gains provisions of the Internal Revenue Code. Rather, it is necessary to determine the precise nature of the property taken."

The court further held that, if the government had taken a fee in the facilities or damaged them physically beyond the ordinary wear and tear incident to normal use, the resulting compensation would no doubt have been treated as gain from the involuntary conversion of capital assets. The essence of the court's opinion is found in these words (page 135, 80 S.Ct. page 1501):

"Further, the right is manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in value over cost built up in several years, which is what Congress sought to ameliorate by the capital-gains provisions. * * * In short, the right to use is not a capital asset, but is simply an incident of the underlying physical property, the recompense for which is commonly regarded as rent. That is precisely the situation here * *."

The situation here does not resemble what was before the Supreme Court there. Here the taxpayer parted absolutely with title to rights it had accumulated over a number of years by contract and by a course of dealing, together with all of the books and records pertaining to those rights and dealings. It kept nothing but transferred to the purchaser all of its rights, title and interest in all of the valuable property rights arising from its relationship and dealings with New York Life. The facts before us differentiate this situation from those dealt with in the authorities cited by the Commissioner and the arguments advanced by him. We think that the Tax Court reached the wrong legal conclusion from facts which were either stipulated, or in writing, or established by testimony which was uncontradicted, and we hold that the Mortgage Company was entitled to capital gain treatment on the amount of $121,841.11 received by it from Cobbs, Allen and Hall Mortgage Company.[6]

6. We have dealt with the issues presented to us in briefs and argument and decided by the Tax Court upon the case as presented to it. The Commissioner defined his position in the notice of deficiency (90 day letter) he gave to the Taxpayer March 24, 1959 and maintained it steadfastly throughout as the sole basis for his action and contentions. The notice stated:
"* * * It is determined that the $121,841.11 received by you from Cobbs, Allen & Hall Mortgage Company, Inc.,

And the Petition to Review is granted, the judgment of the Tax Court is reversed and the cause remanded for further handling consonant with this opinion as it relates to the case between Nelson Weaver Mortgage Company, Inc., Petitioner, and Commissioner of Internal Revenue, Respondent.

The controversy between the Commissioner and Nelson Weaver Realty Company grows out of a contract executed by the Realty Company with Cobbs, Allen and Hall, a partnership, simultaneously with the execution of the contract of sale between Nelson Weaver Mortgage Company, Inc. and Cobbs, Allen and Hall Mortgage Company dated January 29, 1955. This contract was part of the same transaction, and the Realty Company was owned in major part by Nelson Weaver and occupied the same quarters as the Mortgage Company. The two corporations carried on different phases of an integrated real estate and insurance business.

The Realty Company sold to the Cobbs-Allen partnership: "any rights we may have to write certain hazard insurance in connection with the loans on which the servicing contract * * * will be transferred and sold by Nelson Weaver Realty Company, Inc." to Cobbs-Allen, Inc. The contract further provided that the accounts of the Realty Company covering the insurance policies theretofore written by it upon the property covered by the Mortgage Company servicing contract would be sold for an agreed price of $8,000.00.

The contract contained an agreement that the Realty Company would not solicit nor write the renewal insurance on the policies covering the mortgages transferred by the Mortgage Company unless Cobbs-Allen should request it, and that the outstanding policies theretofore written by Realty Company would not be molested by the Cobbs-Allen partnership.

The Tax Court stated that it was "unable to find or identify any capital assets which actually were sold by Realty Company * * * [and] there is no evidence that Realty Company sold or transferred to Cobbs-Allen partnership any records or files relating to any policies which it had theretofore written." It concluded:

"As we see it, the real benefit which the Cobbs-Allen partnership received for its $8,000.00 payment, was Realty Company's covenant not to compete in seeking renewals of policies covered by New York Life loans. The law is well established that a payment received for a covenant not to compete is fully taxable as ordinary income. See Richard Ullman, 29 T.C. 129, and the cases therein cited and discussed."

We agree with the Tax Court's findings and conclusions. While Realty Company's contract contains provisions referring vaguely to capital assets, these provisions are indefinite and the evidence offered by it in support of them is hazy and unconvincing. We agree with the Tax Court that the chief object of this $8,000.00 payment was to insure that the parties would abstain from compet-

in connection with the transaction relating to the servicing of mortgages owned by New York Life Insurance Company constitutes the lump sum receipt of future income taxable as ordinary income. There was no sale of a capital asset as defined in section 1221 of the Internal Revenue Code of 1954 or of an asset used in a trade or business which would be accorded capital gains treatment under section 1231 of the Code. * * * "

As an appellate court, we could not have done otherwise. 3 Am.Jur., Appeal and Error, pages 35–37, § 253, especially Note

8; Duignan v. United States et al., 1926, 274 U.S. 195, 199–200, 47 S.Ct. 566, 71 L.Ed. 996; Blair, Commissioner v. Oesterlein Machine Co., 1927, 275 U.S. 220, 225, 48 S.Ct. 87, 72 L.Ed. 249; American Bemberg Corp. v. United States, 3 Cir., 1958, 253 F.2d 691, 693–694; Commissioner v. Belridge Oil Co., 9 Cir., 1959, 267 F.2d 291, 294–295; Stanley et al. v. United States, 6 Cir., 1957, 245 F.2d 427, 435; and cf. United States v. Bess, 1958, 357 U.S. 51, 54–55, 78 S.Ct. 1054, 2 L. Ed.2d 1135.

ing with each other, and that the money received by the Realty Company was taxable as ordinary income. The Petition to Review is denied, and the judgment of the Tax Court with respect to this item of $8,000.00 is affirmed.

Reversed and remanded upon the Petition for Review of Nelson Weaver Mortgage Company, Inc., and affirmed upon the petition of Nelson Weaver Realty Company.

RIVES, Circuit Judge (concurring in part and dissenting in part):

I concur as to the item of $8,000.00 paid to the Realty Company.

It seems to me, however, that a substantial part of the $121,841.11 paid to the Mortgage Company was for the right to receive service fees for the remaining years of the outstanding loans. To that extent the Mortgage Company was simply converting future income into present income. Commissioner v. P. G. Lake, Inc., 1958, 356 U.S. 260, 267, 78 S.Ct. 691, 2 L.Ed.2d 743.

The sale of "all of the rights, title, obligations and benefits pertaining to the servicing contract," like the sale of any going business, should, I think, be comminuted into its fragments and the "purchase price" should be allocated among the various assets sold. Williams v. McGowan, 2d Cir., 1945, 152 F.2d 570, 572;[1] C. I. R. v. Chatsworth Stations, Inc., 2d Cir., 1960, 282 F.2d 132, 135. I would agree that a part of the $121,-841.11 represented the purchase price of capital assets.

It seems to me that the case should be remanded to the Tax Court so that it might allocate the amount according to the realities of the transaction. Then, the part allocated to the right to receive service fees should be taxable as ordinary income and the remainder should be taxable as long-term capital gain, I therefore concur in part and respectfully dissent in part.

1. See the reference to and oblique approval of that case in Watson v. Commissioner,

1953, 345 U.S. 544, 552, 73 S.Ct. 848, 97 L.Ed. 1232.